731 F.2d 574
 Daryl Jean PLUMMER, by her next friend and husband, Michael
PLUMMER, on behalf of herself and all other
persons similarly situated and Christine
Muff, Appellants,
v.
Terry BRANSTAD, individually and in his official capacity as
Governor of the State of Iowa, Michael V. Reagen,
individually and in his official capacity as Commissioner of
Iowa Department of Social Services, and Mary Brosnahan,
individually and in her official capacity as Title XX
Supervisor, Appellees.
 No. 83-1702.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 14, 1983.
Decided April 9, 1984.
 
 Thomas J. Miller, Atty. Gen. of Iowa, Gordon E. Allen, Sp. Asst. Atty. Gen., Candy S. Morgan, Asst. Atty. Gen., Des Moines, Iowa, for appellees.
 Carroll L. Lucht, Marcia Kull, Student Legal Intern, Civ. Litigation Project, College of Law, University of Iowa, Iowa City, Iowa, for appellants.
 Before HEANEY, ROSS and FAGG, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Daryl Jean Plummer, by her next friend and husband Michael, and Christine Muff, individually and as representatives of a class of similarly situated persons, sued various officials of the State of Iowa alleging unlawful discrimination under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 794 (Supp. V 1981). A United States magistrate, deciding the case with the consent of the parties under 28 U.S.C. Sec. 636(c) (Supp. V 1981), dismissed the action on May 3, 1983, because the plaintiffs were not "otherwise qualified" to participate in the program at issue. We affirm on the alternative ground that the State denied the plaintiffs participation in that program for a reason other than their handicaps.
 
 I. BACKGROUND
 
 2
 Plummer suffered from Huntington's Chorea, a progressive degenerative disease of the central nervous system, since age eighteen. Because of the physical and communicative impairments resulting from her disease, Plummer resided at the Fourth Avenue Care Center in Cedar Rapids, Iowa, an intermediate care facility (ICF) for the handicapped (a facility providing personal care, including medical services, to persons in need of twenty-four-hour assistance under the direction of a registered nurse or licensed practical nurse, Iowa Code Ann. Sec. 135C.1(2) (West Supp.1983)).
 
 
 3
 Between 1976 and September, 1981, Plummer daily attended an adult day care program provided at the United Cerebral Palsy Center in Cedar Rapids. Her participation in that program was funded under Title XX of the Social Security Act, as amended, 42 U.S.C. Secs. 1397-1397f (Supp. V 1981). In April, 1981, the State informed her that she would no longer be eligible to receive Title XX funding for her adult day care services because Iowa regulations prohibited such funding on behalf of ICF residents. Specifically, Section 151.3(2) of the Iowa Department of Human Services regulations stated in part, "Adult day care services [funded under Title XX] shall be provided only to persons over eighteen years of age who are impaired and are incapable of independent living without such services but who do not require twenty-four-hour inpatient care." Iowa Admin.Code Sec. 770-151.,3(2).[1] Plummer's appeals through the state administrative process were unsuccessful, and her Title XX funding ended on August 31, 1981.
 
 
 4
 On November 12, 1981, Plummer filed the present action alleging, inter alia, that the State's termination of Title XX funding for her adult day care services constituted discrimination on the basis of her handicap prohibited by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 794 (Supp. V 1981). She pursued the action until her death on March 19, 1983;[2] since that time, her husband Michael Plummer has participated on her behalf.
 
 
 5
 In July, 1982, Muff intervened in the action. Muff has been diagnosed as severely and profoundly mentally retarded since birth. She has various physical and psychological impairments and has lived at Oakwood Manor, an ICF located in Clear Lake, Iowa, since May of 1976. Sometime in 1976, she began receiving adult day care services five days a week at Handicap Village in Clear Lake. In 1981, the State invoked section 151.3(2) of its human services regulations to terminate Title XX funding for Muff's adult day care services. At the time of the magistrate's decision below, Muff's parents paid for her to continue to receive adult day care services at Handicap Village two days a week. As with Plummer's action, Muff claimed among other things that the State's termination of Title XX support for her attendance at Handicap Village constituted impermissible discrimination on the basis of her handicap.
 
 
 6
 On September 8, 1982, the United States District Court for the Northern District of Iowa certified the case as a class action on behalf of "all elderly and handicapped adults in the state of Iowa who have applied for, received, or been eligible for Title XX adult day care services since January, 1981, but who have been or will be denied such services because their condition requires twenty-four hour inpatient care." Plummer v. Branstad, No. C 81-133, slip op. at 2 (N.D. Iowa May 3, 1983) (order of magistrate). On January 24, 1983, the district court referred the case to a magistrate for final disposition at the behest of the parties. The parties submitted the case upon a stipulated record together with written briefs and arguments.
 
 
 7
 The magistrate made specific findings of fact with regard to Muff and the application of section 151.3(2) to her case. He found it unnecessary to deal with Plummer's case separately given her intervening death. In his findings of fact, the magistrate indicated that Title XX funding of adult day care services in Iowa was designed principally to enable participants to live in family settings and to avoid institutionalization. He stated that, although adult day care services could be beneficial to Muff and other ICF residents, "[s]ubstantially all of the types of services provided by an adult day care center are provided by an intermediate care facility." Plummer v. Branstad, supra, No. C 81-133, slip op. at 5. He further found that the State subsidized the plaintiffs' residence in Iowa ICFs at a cost of $26.50 per person per day, while adult day care for these same individuals, if funded under Title XX, would "cost" the State an additional $18.96 per person daily.[3] He finally found that "[a]vailing Title XX funding to a resident of an ICF for adult day care services results in a duplication of many of the same kinds of services and would impose a substantial financial burden upon defendants [the State]." Id. at 6.
 
 
 8
 From these factual findings, the magistrate concluded that the plaintiffs, as individuals and as a class, were not "otherwise qualified" to participate in the Title XX adult day care funding program. He noted that the plaintiffs were not denied enjoyment of adult day care services; rather, they were denied public Title XX funding for their receipt of such services. Id. at 11. Because the "principal benefit and goal" of Title XX funding for these services was to avoid institutionalization of participants, and no plaintiff showed that participation in adult day care services would vitiate her or his need for twenty-four-hour ICF care, the magistrate held that the plaintiffs were not qualified to participate in the funding program. Id. at 11-13. Further, the magistrate held that any modification of the program to include the plaintiffs would defeat the goal of avoiding institutionalization of participants, which would be an unreasonable accommodation in the program. Id. at 14-18. He thus found no violation of the prohibition against handicap discrimination in the 1973 Rehabilitation Act. The plaintiffs appeal.
 
 II. DISCUSSION
 
 9
 The sole question presented on appeal is whether section 151.3(2), as applied to deny the plaintiffs Title XX funding for their participation in adult day care programs, violates the antidiscrimination section of the Rehabilitation Act of 1973. Section 504 of that statute provides in pertinent part:
 
 
 10
 No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency or by the United States Postal Service.
 
 
 11
 29 U.S.C. Sec. 794 (Supp. V 1981).
 
 
 12
 The Second Circuit recognized four elements of proof necessary for a plaintiff's success under section 504: (1) that the plaintiff is a "handicapped individual" under the terms of the statute; (2) that the plaintiff is "otherwise qualified" to participate in the program or activity at issue; (3) that the plaintiff was excluded from the program or activity "solely by reason" of her or his handicap; and (4) that the program or activity receives federal financial assistance, or is conducted by an executive agency or the United States Postal Service. Doe v. New York University, 666 F.2d 761, 774-775 (2d Cir.1981).
 
 
 13
 The parties to the instant appeal do not question the magistrate's holdings that Muff and apparently all class members are handicapped individuals as defined in the statute and that the program here at issue is one which receives federal financial assistance. See Plummer v. Branstad, supra, No. C 81-133, slip op. at 9. The other elements of section 504 were not so clearly established.
 
 
 14
 The magistrate focused his attention on whether the plaintiffs were otherwise qualified to participate in the Title XX adult day care funding program. In our view, the more appropriate inquiry in this case is whether the plaintiffs were excluded from the program solely by reason of their handicaps. In determining whether individuals are "otherwise qualified," we look to their physical, emotional, or psychological abilities, their educational or experiential backgrounds, or their financial or personal needs. Cf. Southeastern Community College v. Davis, 442 U.S. 397, 400-406, 413, 99 S.Ct. 2361, 2364-2367, 2370, 60 L.Ed.2d 980 (1979) (plaintiff with severe hearing impairment could not meet legitimate physical requirements of nursing program); Simon v. St. Louis County, 656 F.2d 316, 320-321 (8th Cir.1981), cert. denied, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982) (plaintiff's physical ability to execute forceable arrests and to transfer among all police department positions in issue).
 
 
 15
 In the instant case, the criterion upon which the plaintiffs were excluded from Title XX funding--their receipt of ICF twenty-four-hour care providing substantially similar services at public expense--on its face had nothing to do with their individual abilities, backgrounds, or circumstances. Therefore, the "otherwise qualified" question is not the most relevant inquiry. Instead, we must decide whether the plaintiffs were in fact denied Title XX funding because of this criterion rather than because of their handicaps. Based on the factual findings of the magistrate and a proper application of the law, we hold that they were, and therefore affirm the order of the magistrate on this alternative legal ground. See Keniston v. Roberts, 717 F.2d 1295, 1300 & n. 3 (9th Cir.1983); McClain v. Kitchen, 659 F.2d 870, 873 (8th Cir.1981) (per curiam) (affirming judgment of district court on separate legal ground).
 
 
 16
 In deciding whether the plaintiffs were denied Title XX funding "solely by reason of [their] handicap[s]," we make two assumptions without passing on their independent validity. First, we assume that the plaintiffs could physically, emotionally, and psychologically participate in adult day care programs and that they met the means and needs requirements placed on all Title XX applicants in Iowa--in other words, that they were otherwise qualified as individuals to participate in adult day care programs and to receive Title XX funding. In addition, we assume that the severity of the plaintiffs' handicaps is itself a handicap which, under Section 504 of the 1973 Rehabilitation Act, cannot be the sole reason for denying them Title XX funding. See Garrity v. Gallen, 522 F.Supp. 171, 214-215 (D.N.H.1981) (state-run facility for the mentally retarded could not divide services among residents solely based on their degree of retardation or ambulatory status); Lynch v. Maher, 507 F.Supp. 1268, 1278-1279 & n. 15 (D.Conn.1981) (termination of home care funding under Medicaid for quadriplegic because of extent of home care needs preliminarily enjoined).
 
 
 17
 Thus, we directly address the question of whether section 151.3(2) of Iowa's human services regulations excludes otherwise qualified persons from Title XX adult day care funding solely by reason of the severity of their handicaps. The magistrate, although considering the facts under his extended "otherwise qualified" analysis, made clear that section 151.3(2) was designed to provide necessary services to handicapped individuals in Iowa across the board while avoiding duplication of effort and public expense. The magistrate expressly found that substantially all types of services provided by an adult day care center were available in ICFs. Plummer v. Branstad, supra, No. C 81-133, slip op. at 5. He also found that the State subsidized the plaintiffs' residence in Iowa ICFs at a cost of $26.50 per person daily; that providing these same plaintiffs with Title XX funded adult day care would cost an additional $18.96 per person per day in public funds; and that providing both ICF and adult day care services to the plaintiffs would result in duplication of many services and impose a substantial financial burden upon the State. Id. at 6. He concluded, "Enforcement of section 151.3(2) is simply a reasonable method of allocating limited funds amongst different classes of handicapped persons in a fashion so as to achieve the greatest overall benefit." Id. at 17.
 
 
 18
 Our review of the stipulated record supports each of these findings and conclusions. Although section 151.3(2) speaks in broad terms of excluding persons "who * * * require twenty-four hour inpatient care," we are convinced that the State applies the regulation only to exclude persons whose twenty-four-hour inpatient care is publicly funded. Nothing in the record suggests that otherwise qualified, severely handicapped persons who receive twenty-four-hour inpatient care paid from other than public sources, for example from charitable contributions, would be denied Title XX funding for adult day care services. Indeed, we emphasize that were it not for the State's provision of services in ICFs which were substantially similar to those available in adult day care programs, Section 504 would prohibit a distinction based solely on ICF residence, given that persons live in ICFs only because of their handicapped status. Thus, the severity of the plaintiffs' handicaps was not a reason, much less the sole reason, underlying section 151.3(2) and its application; rather, the plaintiffs' receipt of publicly funded ICF care was the reason they were denied further Title XX funding to receive substantially similar adult day care services elsewhere. The State merely chose to reserve the latter funding for those not already receiving the plaintiffs' degree of publicly supported rehabilitative, custodial, or medical care.
 
 
 19
 We have considered the plaintiffs' assertion that certain persons in Iowa residential care facilities (RCFs) (institutions providing twenty-four-hour care to handicapped persons not in need of the additional medical supervision available in ICFs, Iowa Code Ann. Sec. 135C.1(1) (West Supp.1983)) receive Title XX funding for adult day care services over and above their publicly funded RCF care. The plaintiffs contend that this shows that the State denies them similar funding only because of the severity of their handicaps. The record reveals, however, that RCF residents who receive the additional funding live in RCFs without substantially similar, publicly funded daytime activities. The plaintiffs do not allege that any ICF likewise fails to provide such daytime adult activities for its residents. Rather than shedding doubt on the State's motives, this exception proves the rule applied: the exclusion in section 151.3(2) applies consistently to persons receiving adult daytime services at public expense substantially similar to those under Title XX funded adult day care programs, whether those persons reside in ICFs or RCFs.
 
 
 20
 We have likewise considered the plaintiffs' assertion that federal regulations implementing section 504 require invalidation of section 151.3(2). We find no merit to this contention. Suffice it to say that the federal regulations stress effective, equal services for handicapped persons in integrated settings appropriate to their particular needs. See 45 C.F.R. Sec. 84.4 (1983); id. Part 84, Appendix A, Subparts A & F. The State's provision of adult daytime services to ICF residents in their ICFs rather than in separate, Title XX funded adult day care centers does not run afoul of these principles.
 
 III. CONCLUSION
 
 21
 For the foregoing reasons, we affirm the magistrate's order dismissing the plaintiffs' section 504 claim on the merits.
 
 
 
 [1]
 Various regulations for the Iowa Department of Human Services are being transferred from Chapter 770 to Chapter 498 of the Iowa Administrative Code. Thus, Iowa Admin.Code Sec. 770-151.3(2) may soon be found at Iowa Admin.Code Sec. 498-151.3(2)
 
 
 [2]
 Although the Cedar Rapids cerebral palsy center closed its doors in the spring of 1982, the Handicapped Systems Adult Day Care Program for Multi-Handicapped Persons began operations in the same area in August, 1982
 
 
 [3]
 The word "cost" is used loosely in the magistrate's order; in fact, the magistrate recognized that Title XX funding for adult day care services consists of seventy-five percent federal funds, distributed to Iowa counties through the State as part of a federal block grant, and twenty-five percent "local purchase dollars," provided in cash or in kind by the individual counties. Plummer v. Branstad, No. C 81-133, slip op. at 6 (N.D. Iowa May 3, 1983) (order of magistrate)