DAVID B., James S., Richard D., Christine B., Germaine M., Through their Guardian Ad Litem, Patrick T. Murphy, on behalf of themselves and a class of individuals too numerous and transitory to mention, Plaintiffs,

v.

Ann PATLA, Director of the Illinois Department of Mental Health & Developmental Disabilities, Jess McDonald, Director of the Illinois Department of Children and Family Services, and Joseph A. Spagnolo, State Superintendent of Education for the Illinois State Board of Education, Defendants.

No. 79 C 1662.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 27, 1996.

Patrick Thomas Murphy, Office of the Cook County Public Guardian, Chicago, IL, for Plaintiffs.

Barbara L. Greenspan, Attorney General's Office, Chicago, IL, for Jess McDonald.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

The parties settled this dispute almost fifteen years ago with the entry of a Consent Decree. One of the defendants, Jess McDonald, Director of the Illinois Department of Children and Family Services ("DCFS"),[1] no longer wishes his agency to be bound by that agreement. The plaintiffs, a class of adolescent wards and potential wards of the Juvenile Court of Cook County who suffer from severe emotional, physical, or mental impairments, and who previously were denied necessary services by the defendant agencies, oppose any attempt to vacate or modify the Consent Decree. After careful consideration of the memoranda and supplemental memoranda submitted by the parties, we conclude that vacatur or modification of the Consent Decree is not warranted, and therefore deny the defendant's motion.

### I. Background

The original complaint in this action was filed on April 25, 1979, but the relevant pleading for purposes of the instant motion is the Second Amended Complaint ("Complaint") filed on March 1, 1980.[2] The named

1. All of the original defendants in this action, who were sued in their official capacities, have been succeeded since the entry of the Consent Decree. Accordingly, we have automatically substituted the current heads of the defendant agencies as the named defendants. Fed.R.Civ.P. 25(d)(1).

2. A similar action was filed in August 1978 in the Circuit Court of Cook County, and was resolved pursuant to essentially the same settlement

plaintiffs—David B., James S., Richard D., Christine B., and Germaine M.—brought suit on behalf of a class of children in Cook County who (1) were either wards of the Juvenile Court or who had petitions for wardship pending against them in Juvenile Court, and (2) who suffered from emotional, physical, or mental disabilities. Compl. ¶ 3. The Complaint alleges that the plaintiffs' disabilities caused them to commit delinquent and criminal acts, leading the Illinois State's Attorney's Office or other entities to petition for orders adjudicating them wards of the Juvenile Court. *See* 705 ILCS 405/2–13 (abused, neglected, dependent minors), 405/5–13 (delinquent minors). In most cases, however, the State's Attorney's Office did not consider the offenses serious enough, or the children culpable enough, to prosecute the delinquency petitions or seek commitment of the children to the Illinois Department of Corrections ("DOC"). Compl. ¶ 11. While children in this situation would usually be released to the custody of their parents or guardians, the children in the plaintiff class demonstrated such severe mental and emotional disabilities that their families were unable to adequately treat and care for them. *Id.* ¶¶ 10, 13. Instead of incarcerating these children at the DOC, where treatment options were severely limited, judges of the Juvenile Court sought to place these youngsters with various state agencies that could provide treatment and care for them.

However, the plaintiffs alleged that the defendants—the heads of DCFS, the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD"), and the State Board of Education ("SBE")—refused to provide them with necessary services and treatment because of their disabilities. All of the defendant agencies took the position that the children were either too disabled or not disabled enough to receive public services or public funds for private care. Thus, despite the fact that these children had mental and emotional disabilities, DMHDD decided that they were not entitled to treatment from DMHDD because they did not require extended hospitalization. Complaint ¶ 12. DCFS conceded that many of these individuals were neglected and abused, and thus would normally be entitled to assistance, but the agency maintained that the plaintiffs were not entitled to DCFS services because either they were not so abused as to require placement outside the family, or they were too disruptive to be placed with other DCFS children. *Id.* ¶¶ 13, 29–30. SBE acknowledged that these children had special educational needs, but considered them the problem of DMHDD and DCFS because they required placement in residential treatment programs. As a result, these children "fell between the placement cracks," and were left to fend for themselves at the DOC or on the streets. *Id.* ¶¶ 11–23.

The putative class action Complaint alleged that the defendants denied the plaintiffs necessary services because of their disabilities, and that this conduct violated Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. On September 4, 1980, Judge John Powers Crowley denied the defendants' motion to dismiss the Complaint in an unpublished opinion. The court concluded it could not dismiss the plaintiffs' equal protection claims because, based on the allegations in the Complaint, not even a rational basis had been proffered for the refusal to treat these children. The court also rejected the defendants' attack on the Rehabilitation Act claims, finding that the Complaint sufficiently alleged (1) that the plaintiffs were disabled, (2) that they were "otherwise qualified" for the defendants' services, and (3) that they were being excluded from these services "solely by reason" of their disability.[3]

The action was reassigned to this court on June 30, 1981, and in late 1981 the parties

agreement reached in this case. *David B. v. DeVito*, 86 Ill.App.3d 787, 41 Ill.Dec. 853, 408 N.E.2d 275 (1980).

**3.** The Court also rejected SBE's argument that it owed no duty to provide education services to disabled children. However, the Court did dismiss the claims of three Juvenile Court probation officers for lack of standing, as well as all claims against the Secretary of the United States Department of Health and Human Services.

proposed to resolve the matter through the entry of a Consent Decree. Under the Consent Decree, those children under the age of seventeen (or twenty if already wards of the Juvenile Court) who are referred to the Juvenile Court and alleged to have violated the Illinois Juvenile Court Act, and are in need of "specialized services" such as welfare, mental health treatment, and education, but who have been refused such treatment by the defendant agencies, shall be referred to the Governor's Youth Services Initiative ("GYSI"). Decree at 4–5. The GYSI, a unit staffed by members of DCFS, DMHDD, and SBE, would be entrusted with the obligation of "ensur[ing] that this population of children receive appropriate care and treatment under the least restrictive conditions as may be required in each individual case." *Id.* at 5. Although the Consent Decree does not obligate GYSI or any of its members to take wardship of the plaintiffs, it does require the unit to promptly review referrals, formulate "interim and long term service recommendations" for each child, and develop a "comprehensive service plan" to carry out these recommendations. *Id.* On October 2, 1981, we approved this Consent Decree, entered final judgment on all claims, and retained jurisdiction over the cause to enforce the terms of the decree.

There is no real dispute that since the entry of the Consent Decree, GYSI has operated rather smoothly in its evaluation and placement of children in the plaintiff class. After hearing a delinquency petition against a child with mental or emotional disabilities, a juvenile court judge will refer that child to GYSI if the judge concludes that commitment of the child to DOC would be inappropriate. After receiving a report on each child from the probation department, a GYSI panel comprised of representatives from the defendant agencies evaluates each referral and proposes recommendations. For most of the children, GYSI recommends residential placement in a facility that can provide adequate supervision and treatment. Since none of the defendant agencies operates this type of facility, the children are usually placed with private treatment providers that bill the defendants for the cost. Although the Consent Decree does not explicitly apportion the costs of such treatment among the defendants, in practice DCFS has borne approximately one-third of the cost of treating these individuals. Since the entry of the Consent Decree, none of the parties has come before this court to request enforcement or modification of the agreement.

However, DCFS now contends that because of changes in federal and state law since 1980, the plaintiffs no longer have a substantial federal claim supporting enforcement of the Consent Decree.[4] Specifically, the defendant maintains that its rejection of the plaintiffs does not violate the Rehabilitation Act because this decision is not made "solely" by reason of the plaintiffs' disabilities. Alternatively, DCFS maintains that recent amendments to both its enabling statute and the Juvenile Court Act prevent the agency from paying for services provided to minors above the age of thirteen who are charged with criminal conduct or adjudged delinquent. Therefore, DCFS argues, this substantial change in Illinois law removes any valid federal claim for many of the plaintiffs since these persons are no longer "otherwise qualified" for DCFS services. The agency contends it should no longer be obligated by the Consent Decree, or at a minimum, DCFS should not be required to pay for the residential treatment of those over age thirteen who have been charged with a crime or adjudicated delinquent.[5]

## II. Standard for Vacating or Modifying a Consent Decree

Despite the fact that all the parties to this dispute voluntarily agreed to abide by the

---

**4.** DCFS also argues that many of the children referred to GYSI are charged with a wide range of rather violent offenses, and that the treatments proposed by GYSI have become more expensive because of the dangerous propensities these children possess. However, DCFS does not argue that these changes are so unexpected and significant in themselves to justify vacatur or modification of the decree. Thus, we need only consider this argument to the extent it illuminates our understanding of the operation of GYSI and the recent enactments of the Illinois legislature.

**5.** The heads of the other defendant agencies have not objected to DCFS's motion.

terms of the Consent Decree, this does not preclude DCFS from arguing that its obligations under the decree should be lifted. In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992), the Supreme Court held that although consent decrees are contractual in nature, they are essentially judicial decrees that may be modified according to the rules applicable to other judgments and decrees. Specifically, consent decrees may be modified or vacated pursuant to Federal Rule of Civil Procedure 60(b)(5):

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application....

"A party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383, 112 S.Ct. at 759. Although district courts must be flexible in their application of Rule 60(b)(5), in general, modification or vacatur of a consent decree will be justifiable only if the movant shows "a significant change either in factual conditions or the law." *Id.* at 384, 393, 112 S.Ct. at 760, 764. The former sort of change must be a significant factual variation that the parties did not anticipate at the time they entered into the decree. *Id.* at 384–85, 112 S.Ct. at 760–61. The latter type of change may include alterations in federal law that now prohibit a party from performing its obligations under the decree, or changes that "make legal what the decree was designed to prevent." *Id.* at 388, 112 S.Ct. at 762. The Court in *Rufo* further explained that "[w]hile a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties had based

their agreement on a misunderstanding of the governing law." *Id.* at 390, 112 S.Ct. at 763. Thus, after considering whether the district court properly exercised its discretion in refusing to modify a consent decree covering a county jail, the Court remanded for the district court to determine whether (1) the increase in the population of pretrial detainees was unexpected at the time of the decree, or (2) the parties misunderstood the law regarding "double-celling" of inmates at the time they signed the decree. If either of these conditions existed, the administrators of the county jail were entitled to argue that modification of the consent decree was warranted.[6]

In *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir.1993) (*Evans III*), cert. denied, 511 U.S. 1082, 114 S.Ct. 1831, 128 L.Ed.2d 460 (1994), the Seventh Circuit sitting en banc addressed the impact of *Rufo* on consent decrees entered against municipalities. The plaintiffs in *Evans III* had based their claims on the Due Process and Equal Protection Clauses, and originally a portion of these claims had been upheld by a panel of the Seventh Circuit. *Evans v. Chicago*, 689 F.2d 1286, 1299–1300 (7th Cir.1982) (*Evans I*). However, a subsequent panel reversed this decision, *Evans v. City of Chicago*, 873 F.2d 1007, 1015–18 (7th Cir.1989) (*Evans II*), and on the third consideration by the Seventh Circuit a plurality of the court vacated the consent decree that had been entered into by the parties during the years between *Evans I* and *Evans II*. The plurality in *Evans III* reasoned that the consent decree did not actually settle the issues between the parties, *id.* at 476–77, and that even if it did, concerns of federalism and democracy prevented the district court from enforcing the decree after the federal claims had been rejected in *Evans II*, *id.* at 477–481. The plurality concluded that the City of Chicago could no longer be held to the terms of a consent decree previously entered into by the parties, because the "entry and continued enforcement of a consent decree regulating the op-

---

**6.** Although the Supreme Court spoke only of modification in *Rufo*, the defendant's primary argument for vacatur is based on subsequent changes in the law. We see no reason why *Rufo* would not apply to DCFS's request to vacate the Consent Decree, and therefore analyze the issue according to the standards outlined in that case.

eration of a governmental body depend on the existence of a substantial claim under federal law." *Id.* at 480. Judge Ripple concurred in the judgment of the court, but refused to adopt the broad tenets advocated by the plurality for dealing with federal consent decrees entered into by municipalities. *Evans III*, 10 F.3d at 483 (Ripple, J., concurring). Rather, he simply concluded that— under the unique procedural posture of the case—the prevailing law had changed to such a degree as to render continued enforcement of the decree against the City of Chicago "inappropriate." *Id.*

■ Although DCFS argues that we are bound to accept the reasoning of the plurality opinion in *Evans III*, and therefore must vacate the instant decree if we find no substantial federal claim underlying the plaintiffs' Complaint, we do not believe *Evans III* so constrains us. At least with regard to interpreting Supreme Court opinions:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [a majority of] Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...."

*Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); *accord Romano v. Oklahoma*, 512 U.S. 1, 8–9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994). No opinion in *Evans III* commanded a majority of judges on the Court of Appeals, and thus the holding of the case is the narrower grounds adopted by Judge Ripple. That is, vacatur of a consent decree must be granted to a defendant when a prior decision upholding the plaintiff's legal theory is subsequently overruled by the same (or higher) court.

■ Outside of unusual cases where the federal law basis permitting a federal court to enforce a consent decree has disappeared, however, we believe the Supreme Court's more general analysis in *Rufo* controls our resolution of motions to vacate or modify consent decrees. Thus, to prevail on its motion, DCFS must demonstrate that the substantive law underlying the plaintiffs' Complaint has so clearly and dramatically changed as to render continued enforcement of the Consent Decree inequitable. *See* Fed. R.Civ.P. 60(b)(5); *Rufo*, 502 U.S. at 388–90, 112 S.Ct. at 762–63.

### III. Discussion

The defendant's motion springs from recently enacted Illinois legislation that alters the mandate of DCFS with regard to children accused or adjudicated of delinquent offenses. Prior to June 1995, the enabling statute for DCFS allowed the agency, at its discretion, to "accept for care and training any child [aged 13 or older] who has been adjudicated delinquent, addicted, as a truant minor in need of supervision[,] or as a minor requiring authoritative intervention," and required the agency to accept those delinquents under the age of thirteen. 20 ILCS 505/5(*l*) (West 1993). However, in 1995 the State of Illinois amended this statute to read, in pertinent part:

> The Department may, at its discretion except for those children also adjudicated neglected or dependent, accept for care and training any child who has been adjudicated addicted, as a truant minor in need of supervision or as a minor requiring authoritative intervention, under the Juvenile Court Act or the Juvenile Court Act of 1987, but no such child shall be committed to the Department by any court without the approval of the Department. A minor charged with a criminal offense under the Criminal Code of 1961 or adjudicated delinquent shall not be placed in the custody of or committed to the Department by any court, except a minor less than 13 years of age committed to the Department under Section 5–23 of the Juvenile Court Act of 1987....

20 ILCS 505/(*l*) (West Supp.1996) (as amended by P.A. 89–21). Based on the new language in this statute,[7] DCFS has taken

---

7. P.A. 89–21 also amended several provisions of the Juvenile Court Act to include similar language. *See* 705 ILCS 405/2–10, 405/2–27, 405/5–23. However, DCFS does not contend that these

the position that it can no longer "serve" members of the plaintiff class aged thirteen and over through GYSI, and has sought to effectuate this reading in various Juvenile Court proceedings.[8] Both the Public Guardian and the Juvenile Court have prevented DCFS from backing out of GYSI, relying on their reading of the Consent Decree in this case. DCFS now seeks to vacate or modify the Consent Decree so that its obligations under the decree conform to the agency's interpretation of 505/5(*l*).

■ The agency's primary contention is that the plaintiffs no longer have a viable claim under Section 504 the Rehabilitation Act to support their complaint. Section 504 currently reads:

No *otherwise qualified* individual with a disability in the United States, as defined in section 706(8) of this title, shall, *solely by reason* of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (emphasis added). DCFS first argues, based on federal case law decided after entry of the Consent Decree, that its exclusion of the plaintiffs from GYSI is not undertaken "solely by reason" of the plaintiffs' disabilities, and therefore not actionable under Section 504. Specifically, the defendant points to *Traynor v. Turnage*, 485 U.S. 535, 549–51, 108 S.Ct. 1372, 1382–84, 99 L.Ed.2d 618 (1988), in which the Supreme Court considered whether Congress' prohibition against extending the time for receiving veterans' benefits to those who were disabled because of their own "willful misconduct," 38 U.S.C. § 3462(a)(1) (previously 38 U.S.C. § 1662(a)(1)), along with the Veterans Administration regulation interpreting that provision as applying to alcoholics, violated the Rehabilitation Act. The Court observed that

in enacting later amendments to the Rehabilitation Act, Congress did not repeal or amend this "willful misconduct" provision in the VA statute, nor did it "expressly disavow its [prior] determination that primary alcoholism is not the sort of disability that warrants an exemption from the time constraints of § [3462(a)(1)]." *Id.* at 547, 108 S.Ct. at 1381. Thus, the Court concluded that the broad language of Section 504 did not repeal the more specific prohibition against extending certain benefits to those whose disabilities are caused by "willful misconduct." *Id.* 547–48, 108 S.Ct. at 1381–82. In discussing why this reading of these statutes was not implausible, the Court stated:

[T]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons.... Congress is entitled to establish priorities for the allocation of limited resources available for veterans' benefits, and thereby to conclude that veterans who bear some responsibility for their disabilities have no stronger claim to an extended eligibility period than do able-bodied veterans. Those veterans are not, in the words of § 504, denied benefits "solely by reason of [their] handicap," but because they engaged with some degree of willfulness in the conduct that caused them to become disabled.

485 U.S. at 549–50, 108 S.Ct. at 1382–83 (citations omitted). Using similar reasoning, the defendant argues that Section 504 is inapplicable to DCFS's decision to exclude the plaintiffs from GYSI because of their delinquent behavior.

We do not think the matter is as free from doubt as DCFS would have us believe. The above quoted language from *Traynor* does not directly bear on the issue presented in the instant case, since the actual question in *Traynor* was whether Congress had created an exception to the scope of Section 504, not whether a state legislature may do so.[9] In

---

additional amendments raise separate grounds for vacating or modifying the decree.

**8.** DCFS does not dispute that it must provide services to those under the age of thirteen who are adjudicated delinquent.

**9.** Indeed, a Department of Health and Human Services regulation interpreting § 504 states that the Rehabilitation Act does not prohibit "exclusion of a specific class of handicapped persons from a program *limited by Federal statute* or

addition, the rule of law extrapolated by DCFS from *Traynor*—that Section 504 is not concerned about discrimination between groups of disabled persons, or about discrimination based on the severity of one's disability—is directly contradicted by a Department of Health and Human Services ("HHS") regulation interpreting the Rehabilitation Act. 45 C.F.R. § 84.4(b)(1)(iv)[10]; *see also* 28 C.F.R. § 35.130 (Department of Justice regulation for ADA that mirrors § 84.4). Indeed, Judge Crowley relied upon this same HHS regulation when he rejected a similar argument raised by DCFS in 1980, and neither HHS nor Congress has seen fit to alter the language of this provision since that time.

Moreover, the lower courts have not uniformly adopted the defendant's interpretation of Section 504. To be sure, some courts have suggested that discriminating between groups of handicapped persons does not violate Section 504. *E.g., Colin K. by John K. v. Schmidt*, 715 F.2d 1, 9 (1st Cir.1983). However, several others have concluded that the severity of one's disability can itself be disability, and that the denial of services based on the severity of a handicap would contravene Section 504. *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1016 n. 15 (3d Cir.1995) ("While section 504 does not apply to programs choosing among similarly handicapped people, an action under section 504 exists if a program is found to discriminate between distinct classes of handicapped persons."); *Plummer v. Branstad*, 731 F.2d 574, 578 (8th Cir.1984); *Messier v. Southbury Training Sch.*, 916 F.Supp. 133, 141 (D.Conn.1996) (collecting cases); *McGuire v. Switzer*, 734 F.Supp. 99,

114–15 (S.D.N.Y.1990) (permitting paraplegic's § 504 claim of discrimination vis-a-vis blind persons); *Clark v. Cohen*, 613 F.Supp. 684, 692 n. 6, 693–94 (E.D.Pa.1985) (recognizing possibility of such a claim under § 504), *aff'd*, 794 F.2d 79 (3d Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). Indeed, at least two district courts have explicitly rejected the argument that *Traynor* precludes the application of Section 504 to discriminatory actions undertaken because of the severity of a disability. *Messier*, 916 F.Supp. at 142 n. 7; *Martin v. Voinovich*, 840 F.Supp. 1175, 1191–92 (S.D.Ohio 1993).

We need not weigh in on this debate. For purposes of deciding the instant motion, it is sufficient to state that the plaintiffs allege they have been discriminated against because of the severity of their disabilities, and that DCFS has not demonstrated this sort of a claim to clearly fall outside the purview of Section 504. The cases and regulations supporting the plaintiffs' claim that they were discriminated against "solely by reason" of their disability have not been overruled, *cf. Evans III*, 10 F.3d at 480–81 (plurality); *Id.* at 483 (Ripple, J., concurring), and it is far from conclusive that the law is to the contrary, *cf. Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir.1994) (vacating consent decree based on clear and indisputable change in decisional law underlying the plaintiffs' complaint), *cert. denied*, —— U.S. ——, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995). In sum, the defendant has not carried its burden of showing a significant change in the law on this point to justify modification or vacatur.[11]

---

executive order to a different class of handicapped persons." 45 C.F.R. § 84.4(c) (emphasis added).

**10.** "A recipient [of federal funds], in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: ..., Provide different or separate aid, benefits, or services to handicapped persons or *to any class of handicapped persons* unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others...." 45 C.F.R. 84.4(b)(1)(iv) (emphasis added). Because these regulations "were drafted with the oversight and approval of Congress," they are considered "an important

source of guidance on the meaning of § 504." *Traynor*, 485 U.S. at 549, 108 S.Ct. at 1382 (quotations and citations omitted).

**11.** The additional cases cited by DCFS do not show otherwise. The plaintiff in *Talley v. Lane*, 13 F.3d 1031, 1034 (7th Cir.1994), only alleged that he had been denied public housing because of his past criminal record, not because of any disability. *Id.* at 1034. Moreover, the Court of Appeals analyzed the issue according to whether the plaintiff was "otherwise qualified" for the benefit, not whether his exclusion was "solely by reason" of a disability. *Id.* Similarly, *Anderson v. University of Wisconsin*, 841 F.2d 737, 740 (7th Cir.1988), dealt with the question of whether an alcoholic who failed to meet a university's aca-

DCFS's second argument is based on the "otherwise qualified" requirement of Section 504. "An otherwise qualified person is one who is able to meet all of the program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). To determine whether an individual is "otherwise qualified," reference must be made to the state statute or regulation outlining the eligibility requirements of the program receiving federal funding. *Dempsey by Dempsey v. Ladd,* 840 F.2d 638, 640 (9th Cir.1987). Under the defendant's reading of 20 ILCS 505/5(*l*), DCFS is prohibited from providing the plaintiffs with any services to treat their mental and emotional disabilities because they have been brought before the Juvenile Court on delinquency petitions. Therefore, DCFS argues, the plaintiffs are no longer "otherwise qualified" for DCFS services, and their exclusion from the GYSI program does not subvert Section 504.

Although DCFS repeatedly insists that 505/5(*l*) now prohibits the provision of "services" to delinquent youths, Def.'s Mem. at 10, 11, 23; Def.'s Reply Mem. at 12, we do not believe this interpretation is supported by the text of the statute. Initially, the defendant relies on the following portion of the revised 505/5(*l*) to support its argument:

> A minor charged with a criminal offense under the Criminal Code of 1961 or adjudicated delinquent *shall not be placed in the custody of or committed to the Department* by any court. . . .

(emphasis added). The statute does not say that DCFS is prohibited from providing "services" to delinquent individuals, but rather, that these persons cannot be thrust into the "custody" of DCFS or "committed to" DCFS by a Juvenile Court. The Juvenile Court Act defines "legal custody" as a relationship created by court order whereby a custodian is responsible for physical possession, protection, training, and sustenance of the minor.

705 ILCS 405/1–3(9) (West 1996). Similarly, the Juvenile Court Act uses the terms "commitment" and "placement" to indicate the transfer of legal custody of a minor child, along with the concomitant responsibilities of such custody, to another individual or agency pursuant to court order. *See* 705 ILCS 405/2–23, 405/2–27, 405/5–23, 405/5–29 (West 1996).[12] This interpretation is supported by *In re C.T.,* 281 Ill.App.3d 189, 217 Ill.Dec. 219, 221–22, 666 N.E.2d 888, 890–91 (1996), in which the Illinois Appellate Court for the Second District reversed a Juvenile Court order appointing DCFS the legal guardian of a minor who had been adjudicated delinquent. The court stated that the statutes at issue "set[ ] forth a clear prohibition on the *commitment* of such minors to the *custody* of DCFS, excepting only those minors less than 13 years of age," and concluded that the minor's "*commitment to the custody* of DCFS was improper." *Id.* 217 Ill.Dec. at 222, 666 N.E.2d at 891 (emphasis added).

In contrast, referral to GYSI does not equate to "commitment to the custody of DCFS," since it does not entail the transfer of "legal custody" to DCFS, and the agency is not saddled with the "responsibility of physical protection" of the minors referred by the Juvenile Court. Although the parties disagree on which agency or entity performs which functions in the course of a GYSI placement, the essential operations of the GYSI scheme are not disputed. Initially, the Juvenile Court refers a minor to GYSI after concluding that treatment services are more appropriate than commitment to the DOC, and all alternative avenues of obtaining treatment have been exhausted. The GYSI representatives determine whether the minor requires residential treatment or other assistance, and present their treatment recommendations to the court. If the court approves the plan, GYSI representatives from the participating agencies prepare the necessary documentation and arrangements. Where the minor is to be sent for residential treatment outside Illinois, the Juvenile Court

demic requirements was "otherwise qualified" to remain at the institution's law school. The issue presented in these cases—the applicability of the "otherwise qualified" prong of Section 504—is discussed more fully below.

12. *See also* 705 ILCS 405/5–33(3) (requiring appointment of Assistant Director of Corrections as legal custodian for any minor "commit[ted]" to the DOC).

makes a finding of delinquency and adjudges the child a ward of the court, leaving the parents as legal guardians of the minor. If the facility outside Illinois accepts the child, the court orders the minor placed on probation with the condition that he fully cooperate with the staff at the facility chosen by GYSI. None of the GYSI agencies become the minor's guardian or legal custodian, nor do they indicate that they have such authority when arranging the child's treatment. In sum, nothing in the GYSI process leads to the placement of minors into the "custody of or commit[ment] to" DCFS.[13] Rather, participation in GYSI and the Consent Decree is consistent with the agency's charge to "establish and maintain tax-supported child welfare services ... to the end that services and care shall be available on an equal basis throughout the State to children requiring such services," 20 ILCS 505/5(c), and its obligation to provide "child welfare services," 20 ILCS 505/5(a)(3).[14]

Perhaps realizing these problems with its argument, DCFS has changed course in its supplemental briefing and now relies on a different portion of 505/5(l) to support its contention that the plaintiffs are not "otherwise eligible" for DCFS services. DCFS maintains that because P.A. 89–21 removed the word "delinquent" from the portion of the statute authorizing the agency to "accept for care and training any child who has been adjudicated addicted, as a truant minor in need of supervision or as a minor requiring authoritative intervention," the legislature must have intended to remove DCFS's au-

thority to provide services to delinquent minors through any program, including GYSI.

■ As with the defendant's initial attack, we find this view of the law unsupported by the text of 505/5(l). In pertinent part, the relevant provision of the statute reads:

> [DCFS] may, at its discretion except for those children also adjudicated neglected or dependent, accept for care and training any child who has been adjudicated addicted, as a truant minor in need of supervision or as a minor requiring authoritative intervention, ... but no such child shall be committed to [DCFS] by any court without the approval of [DCFS].

20 ILCS 505/5(l). When read in context, it is apparent that the phrase "accept for care and training" refers to the action taken by DCFS when the Juvenile Court commits a minor to the custody of the agency. This interpretation is further supported by the immediately preceding subsection, which states that DCFS "shall accept for care and training any child who had been adjudicated neglected or abused, or dependent *committed* to it pursuant to the Juvenile Court Act or the Juvenile Court Act of 1987." 20 ILCS 505/5(k) (West 1996) (emphasis added). Under this view of the statute, the purpose of deleting the term "delinquent" from the list of those who may be accepted for "care and training" is obvious: given that the paragraph goes on to prohibit the Juvenile Court from "plac[ing] in the custody of or committ[ing] to the Department" any minor

---

**13.** Indeed, the enabling statute for GYSI does not even mention the terms "custody," "commitment," or "placement." *See* 20 ILCS 505/17a–11.

**14.** "Child welfare services" means public social services which are directed toward the accomplishment of the following purposes:
  (A) protecting and promoting the welfare of children, including homeless, dependent or neglected children;
  (B) preventing or remedying, or assisting in the solution of problems which may result in, the neglect, abuse, exploitation or delinquency of children;
  (C) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing the breakup of

the family where the prevention of child removal is desirable and possible;
  (D) restoring to their families children who have been removed, by the provision of services to the child and the families;
  (E) placing children in suitable adoptive homes, in cases where restoration to the biological family is not possible or appropriate;
  (F) assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption;
  (G) providing supportive services and living maintenance which contribute to the physical, emotional and social well-being of children who are pregnant and unmarried;
  (H) providing shelter and independent living services for homeless youth....
20 ILCS 505/5(a)(3).

charged with a criminal offense or adjudged delinquent, it would make no sense if the same subsection required DCFS to nonetheless accept such children for "care and training."

 At bottom, DCFS asks this court to interpret the amendments contained in P.A. 89–21 to say that the agency cannot be made to pay for any services for abused and neglected children who have been charged with a crime or deemed delinquent. However, given that the Illinois legislature could easily have included such language in DCFS's enabling statute, but instead chose only to restrict the ability of the Juvenile Court to "commit" delinquents to DCFS or place them in the agency's "custody," DCFS's interpretation cannot be accepted. Because Illinois law does not preclude the plaintiffs from receiving DCFS services based on their delinquency, DCFS has failed to demonstrate that these children are not "otherwise qualified" for such services. Accordingly, we conclude that the defendant has not satisfied its burden of showing the substantial change in law needed to justify modification or vacatur of the Consent Decree, and its motion must be denied.[15]

### IV. Conclusion

We are cognizant of the federalism concerns implicated any time a federal court requires a state agency to conform its conduct to a judicial decree. Nonetheless, DCFS freely agreed to settle this dispute over a decade ago on the terms outlined in the Consent Decree. There is no indication that performance under the decree has been rendered terribly impracticable due to unexpected changes in the factual circumstances, or that the parties entered into the decree while laboring under a misconception of the law. See Rufo, 502 U.S. at 385, 390, 112 S.Ct. at 760, 763. Nor is it apparent that the federal claims raised by the plaintiffs in their Complaint are insubstantial. Thus, we see no grounds for relieving DCFS from the obligations it voluntarily undertook in 1981. For these reasons, the defendant's motion to

vacate or modify the Consent Decree is denied. It is so ordered.

---

**15.** As we have rejected the defendant's attack on the Rehabilitation Act claim in the Complaint, we need not address the other arguments raised by DCFS against the due process and equal protection claims.