**ALLIANCE TO END REPRESSION, et al., Plaintiffs,**

v.

**The CITY OF CHICAGO, et al., Defendants.**

**American Civil Liberties Union, et al. Plaintiffs,**

v.

**The City of Chicago, et al., Defendants.**

**Nos. 74 C 3268, 75 C 3295.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 30, 1999.

Edward J. Koziboski, Chicago, IL, for Plaintiffs.

Edward W. Feldman, Thomas M. Staunton, Miller, Shakman, Hamilton, Kurtzon & Shlifke, Chicago, IL, Harry Joshua Nelson, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, Paul Anthony Tanzillo, McBreen, Kopko, McKay & Nora , Chicago, IL, Imani Chiphe, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Edward M. Ordonez, Davida Kay Forrest, Sanchez & Daniels, Chicago, IL, Howard Patrick Morris, Margaret A. Unger, Johnson & Bell, Ltd., Chicago, IL, Kenneth Paul Dobbs, Law Offices of Kenneth P. Dobbs, Chicago, IL, Roger Sanford Hutchison, Chicago, IL, Bruce William Melton, Ellen M. Babbitt, Babbitt & Melton, Chicago, IL, for defendant Albert J. Heitman.

R. Joseph Sher, Torts Branch Civil Division, Washington, DC, for F.B.I.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Before the court are the parties objections to a Report and Recommendation ("R & R") issued by Magistrate Judge Bobrick on March 9, 1999. Defendant City of Chicago ("City") asks the court to modify a consent decree entered into nearly twenty years ago. Both sets of plaintiffs, the Alliance to End Repression ("Alliance") and the American Civil Liberties Union ("ACLU") filed a motion with the court to enforce the consent decree. In his R & R, Judge Bobrick denied defendant's motion. For the reasons set forth below, the court adopts Judge Bobrick's R & R as modified and denies defendant's motion to modify the consent decree.

### Background

Magistrate Bobrick does an excellent job detailing the long history of this case and the facts involved. Therefore, the court will not burden the parties, long familiar with this litigation, with a protracted review of what has happened thus far. Instead, the court will simply summarize the points most salient to the issues presented by the current motions.[1]

The consent decree at issue here stems from two prior class action suits in which a number of organizations claimed the City and its agents abridged their First Amendment rights through use of various investigative practices. The consent decree provides extensive regulations intended to govern the City's investigation of political and other activities engaged in by plaintiffs. As Judge Bobrick noted,

> the heart of the decree pertains to police department investigations that are directed toward First Amendment activity, setting out procedures for such investigations (citation omitted) ... It prohibits the gathering of First Amendment information unless it is so necessary to and inseparable from an investigation that its gathering cannot be avoided.... Investigations will be terminated when there is no longer reasonable suspicion of a crime, the investigation's purpose has been achieved, or written authorization has expired... At the conclusion of the investigation, all First Amendment information shall be purged—that is, placed in sealed files—unless there remains reasonable suspicion of a crime and there is a nexus between that and the exercise of First Amendment rights.

---

1. Throughout this opinion, the court may however reference the more detailed facts provided in Magistrate Bobrick's R & R. See *Alliance to End Repression v. City of Chicago,* *et al.,* 74 C 3268 and *ACLU v. City of Chicago, et al.,* 75 C 3295 Report and Recommendation (Magistrate Judge Bobrick, Mar. 9, 1999).

(Mag. Bobrick's R & R at 10.) ("R & R"); *see also Alliance*, 561 F.Supp. 537 (N.D.Ill. 1982) ("*Alliance I* ") The decree also provided various procedures whereby the police would obtain authorizations to investigate protected First Amendment activity. It permits the criminal investigation of First Amendment conduct to obtain evidence of ongoing, past or potential criminal activity where reasonable suspicion exists and a variety of conditions, intended as procedural safeguards, are met. Furthermore, when the police discover that a group is advocating the use of unlawful force in furtherance of the First Amendment, the consent decree permits the City to conduct a brief preliminary investigation that can be extended where use of violence is a credible threat. The decree requires independent audits of police activity and compliance is monitored by the Chicago Police Board.

The City now asks the court to modify the consent decree under Federal Rule of Civil Procedure 60(b). Arguing that Magistrate Bobrick incorrectly recommends denial of its motion, the City urges the court to permit modification of the decree. Plaintiffs of course ask the court to adopt Magistrate Bobrick's R & R and continue enforcement of the consent decree.

### Analysis

The United States Magistrates Act, as amended, allows district court judges to refer pre-trial motions to magistrate judges, who read the submissions of the parties, hold hearings if necessary, and prepare reports and recommendations. *See* 28 U.S.C. § 631 et seq. The appropriate standard of review of the magistrate judge's recommendation is defined by 28 U.S.C. § 636(b)(1). For dispositive motions, such as this one, the statute requires that the district court judge "make a de novo determination of those portions of the [magistrate judge's] ... recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

■■■ Referring motions to magistrate judges is intended to help ease the heavy workloads of the district courts and to aid in the efficient resolution of the disputes. *Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co.*, 747 F.Supp. 1299, 1302–03 (S.D.Ill.1990). Efficiency in judicial administration requires that all arguments be presented to the magistrate judge in the first instance. *Anna Ready Mix*, 747 F.Supp. at 1303. The court need not conduct a new hearing, but must give "fresh consideration to those issues to which specific objections have been made." *Continental Bank, N.A. v. Everett*, No. 90 C 1476, 1994 WL 171660, *1 (N.D.Ill. Mar. 30, 1994), citing 12 Wright & Miller, Federal Practice and Procedure, § 3076.8. It is with these principles in mind that the court reviews each party's objections.

■■■ In essence, Magistrate Judge Bobrick ruled that the City's motion must be denied because it fails to meet the burdens established by Federal Rule of Civil Procedure 60(b).[2] Under Rule 60(b)(5), "the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application" Fed.R.Civ.P. 60(b)(5). The Supreme Court has construed Rule 60(b) to require a party seeking modification of a consent decree to "bear[ ] the

2. Even though the parties have submitted factual statements similar to those required on a motion for summary judgment, the court reviews defendant's request to modify the consent decree under Rule 60(b), not Rule 56 of the Federal Rules of Civil Procedure. It is the court's view that the parties utilized the mechanisms provided in Local Rule 12 as a practical matter, to facilitate the court's consideration of the extensive submissions, not to establish a distinct procedural posture for review. Furthermore, the issues involved on this motion are principally legal in nature.

burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance. A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 382, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

Judge Bobrick suggests that defendant's motion can be denied on two separate bases: (1) the City's motion is untimely and therefore the court has no jurisdiction to consider it and (2) under *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the City cannot establish that modification is warranted. (R & R at 17, 21.) The following objections have been submitted to the court.

## I. City's Objections

According to the City, Judge Bobrick has wrongly concluded that it fails to satisfy the requirements of Rule 60(b). Defendant maintains that in light of the circumstances, its filing of the Rule 60(b) motion is timely and that it has met the burdens established by *Rufo*.

### A. Timeliness

Magistrate Bobrick rightly points out that Federal Rule of Procedure 60(b) provides that a motion brought under this provision "shall be made within a reasonable time." Fed.R.Civ.P. 60(b). The City's principal argument on the merits is that a Seventh Circuit opinion issued in 1984 warrants a modification of the consent decree. Judge Bobrick arrives at the very reasonable conclusion that thirteen years (from 1984 to 1997 when the City filed its motion to modify the consent decree) "is not just an unreasonable delay in filing such a motion, but an *incredibly* unreasonable delay." (R & R at 14.) Citing several cases in which the court denies a party's request to modify judgment for

unreasonable delay, Judge Bobrick suggests that dismissal of the City's request would be appropriate here as well. *U.S. v. Deutsch*, 981 F.2d 299, 302 (7th Cir.1992) (two-year delay unreasonable); *Lee v. Village of River Forest*, 936 F.2d 976, 980 (7th Cir.1991) (two-year delay is unreasonable); *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir.1986) (four month delay).

■ In response to Magistrate Bobrick's concerns, the City asserts that its delay was reasonable "both because it wished to establish that its prior and quite egregious investigation practices had been completely eliminated before seeking modification of the doctrine, and because the law governing the modification of the decree in 1984 contained a significantly more onerous standard for modification than the standard subsequently adopted by the Supreme Court in *Rufo*." (Def.'s Mem. at 2.) While courts tend to find multi-year delays inexcusable, "[t]here is no hard and fast rule as to how much time is reasonable for the filing of a Rule 60(b)(6) motion; courts have found periods of as little as a few months unreasonable, and have found periods of as long as three years reasonable." *Sudeikis v. Chicago Transit Authority*, 774 F.2d 766, 769 (7th Cir.1985) (eight year delay unreasonable).

■ On its face, the City's thirteen year delay does seem unreasonable. Yet under certain circumstances, the court may excuse such a delay. "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other parties." *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir.1986), citing *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir.1981). Although the court finds the City's delay at the very least, curious, it is reluctant to dispose of such a vital matter on procedural grounds—regardless of how irresponsible the City's actions appear. The Court in *Rufo* reminds us, "The upsurge in institu-

tional reform litigation since *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Rufo,* 502 U.S. at 380–81, 112 S.Ct. 748. The court agrees wholeheartedly with Magistrate Judge Bobrick's characterization of the City's delay and finds defendant's arguments to the contrary unpersuasive. Yet, given the import of the issues involved here, the court will nonetheless proceed to the merits.[3] *See Rufo,* 502 U.S. at 376, 112 S.Ct. 748 (motion to modify based upon decision rendered 10 years earlier); *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (motion to modify based, in part, upon decision nine years earlier). Although the court finds that the City's motion can be denied for failure to file in a timely manner, it will also set forth alternative bases for denial.

## B. *Rufo* standard

The City sets forth several arguments in support of its contention that it satisfies the burdens delineated in *Rufo*. First, it argues that the law governing the City's investigative practices changed in 1984 when the Seventh Circuit rendered its decision in *Alliance to End Repression, et al. v. City of Chicago,* 742 F.2d 1007 (7th Cir.1984) (*Alliance II*). Second, it contends that the factual circumstances have changed in that defendant no longer engages in the misconduct that gave rise to the decree. Third, the City asserts a two policy arguments in support of modification. It argues that the decree constrains local power in perpetuity and that it is

unduly burdensome. The court will address each argument in turn.

### 1. Change in the law under *Alliance II*

Under *Rufo,* "a decree must be modified if one or more of the obligations placed upon the parties later becomes impermissible under federal law, and may be modified when the statutory or decisional law has changed to make legal what the decree was designed to prevent. . . . [or] if the parties had based their agreement on a misunderstanding of governing law." *Rufo,* 502 U.S. at 369, 112 S.Ct. 748. The City maintains that the Seventh Circuit "changed the legal landscape in which the parties entered into the *Alliance* decree and substantially eroded the federal claims upon which the Decree was based." (Def. Mem. at 24.) Alternatively, the City suggests that the law was so unsettled at the time the consent decree was created, the parties agreement is based on a misunderstanding of the law. The City submits that "the parties could have concluded that the decree was a permissible remedy for at least arguable constitutional violations." (Def.'s Mem. at 28.)

Magistrate Judge Bobrick rejected both of the City's arguments and concluded that "The [*Alliance II* ] court did not announce a change in the law, as the City would have it . . . Rather, the court found that the new guideline was not inconsistent with the consent decree." (R & R at 20.) Judge Bobrick also discarded the City's argument that the decree was based upon a misunderstanding of the governing law. "The City does not even address the purported misunderstanding or provide evidence of it anywhere in its statement of facts." (R & R at 21.)

This court agrees with both Judge Bobrick's and plaintiffs' assessment of *Alli-*

---

3. Furthermore, the City bases its argument for modification, in part, on their claim that factual circumstances no longer warrant the decree as it now reads. The City seems to argue that it has taken several years for these changed circumstances to come to fruition and as such, defendant's delay is justified.

Although this position seems more like a post-hoc rationalization than a reasonable excuse, the fact that there is no clear start date for the changed circumstances provides an additional reason for the court not to deny defendant's motion as untimely.

*ance II*'s effect. In *Alliance II*, the Seventh Circuit, en banc, considered whether a portion of national guidelines governing domestic security and terrorism investigations by the FBI violated a consent decree, similar to the one in this case and intended to prevent infringement of First Amendment rights. In that case, the relevant portion of the consent decree read as follows:

> The parties agree that the following general principles apply to FBI activities relating to the domestic activities of United States persons: (a) The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States.

*Alliance II*, 742 F.2d at 1010; citing paragraph 3.4(a), 91 F.R.D. 182 (N.D.Ill. 1981). Plaintiffs sought to exclude the following sentence from the new FBI guidelines ("Smith guidelines"), charging that they violated the mandates of the consent decree: "When, however, statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm." *Alliance II*, 742 F.2d at 1010. The district court agreed with plaintiffs that this sentence violated the consent decree and issued an injunction barring the language of the Smith guidelines. *Alliance*, 561 F.Supp. 575, 582–83

(N.D.Ill.1983); aff'd 733 F.2d 1187 (1984). However, on rehearing en banc the court reversed the district court decision. *Alliance II*, 742 F.2d 1007 (7th Cir.1984).

The Seventh Circuit held that the consent decree and the new guidelines were not irreconcilable on their face. Rather than finding that the decree trumped the new guidelines or vice versa, the court held that a reasonable interpretation of the decree and the guidelines allowed for a reconciliation of the two means of governing FBI investigations. "By reading the critical sentence in the decree as prohibiting improperly motivated investigations (other parts of the decree, not in issue in this appeal, prohibit improper investigative techniques), we can reconcile the decree and the new guidelines, maintain a proper separation of powers, yet protect the First Amendment rights of the plaintiffs and the other class members." *Alliance II*, 742 F.2d at 1019–20.

*Alliance II* did not announce a change the law warranting modification of the consent decree. The court stopped well short of doing that. It stated, "Any actual as distinct from purely verbal threat to compliance with the decree lies in the future; we decline to anticipate that the Justice Department will so interpret the new FBI guidelines as to violate the district court's decree." *Alliance II*, 742 F.2d at 1019. Rather than finding that, as defendant suggests, it is legal to conduct investigations of First Amendment activity without reasonable suspicion, the court simply held that the language of the consent decree is open to an interpretation that does not prohibit the police from performing investigations of First Amendment activity where a proper motive is found-a proper motive being one that is supported by evidence that an investigation is warranted and that the investigating agency is not infringing upon the rights of those who are simply exercising their First Amendment rights.[4]

---

4. The court is puzzled by the City's repeated references to the "clear holding enunciated in *Alliance II*." For example, "The en banc *Alliance* opinion makes plain that much of what the Decree is designed to prevent is in fact entirely legal." (Def.'s Mem. at 24); and "it

Just as the holding in *Alliance II* was consistent with the FBI consent decree, it is so with the decree in this case. The ACLU plaintiffs say it well. "The *Alliance* court did not *change* First Amendment law. Instead, the focus of the opinion was contractual construction, not constitutional adjudication. To understand the 'context' of the FBI Decree in order to construe it (citation omitted), the Court found it necessary to set forth the law, *as it was*, not make new law." (ACLU's Mem. at 60.) The holding in *Alliance II* is limited, confined to the unique provisions of the FBI consent decree and the proposed guidelines whose implementation plaintiffs argued would create noncompliance under the decree. Therefore, this court rejects the City's contention that the *Alliance II* court eroded the First Amendment claims upon which the decree in this case were based, or that it "made legal" anything the decree was designed to prevent.

### 2. Misunderstanding of the law

Citing Judge Getzandanner's comments concerning the uncertainty of the law on government investigations of political and First Amendment activity, the City urges the court to interpret *Alliance II* as a clarification of the law warranting modification of the consent decree. According to the City, "when a decree is based on the parties' uncertainty about an unsettled area of law, a subsequent clarification in the law will warrant relief under Rule 60(b)(5)." (Def.'s Mem. at 29–30.) The

court in *Rufo* suggests otherwise. "To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and would serve as a disincentive to negotiation of settlements in institutional reform litigation." *Rufo,* 502 U.S. at 389–90, 112 S.Ct. 748.

Before a court will modify a consent decree based upon a misunderstanding of the law, the court must find that both parties were mistaken as to the law and that the decree was founded upon that mistaken view. "While a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law." *Rufo,* 502 U.S. at 390, 112 S.Ct. 748. Plaintiffs contend that no such misunderstanding existed at the time the parties entered into the consent decree. "[T]he parties did not base their City decree on any joint belief as to the constitutionality of police intelligence activities .... If the parties simply disagreed as to the law, as was the case here, a clarification does not constitute a *Rufo*-type change in the law" (Alliance Mem. at 5.) An examination of the decree finds support for the Alliance plaintiffs' version of events.

A review of the decree makes clear that the parties were not in agreement as to the state of the law. "The Settlement does

is plain that the Decree's prohibition on investigations that are begun as a result of statements that are protected by the First Amendment, but which have a proper law enforcement purpose, enjoins investigative activity that is entirely lawful." (Def.'s Mem. at 25.); and "this Decree merits modification because it enjoins conduct that the opinion makes plain a federal injunction should not proscribe." (Def.'s Mem. at 27.); and "The en banc *Alliance* opinion makes clear that the Decree's prohibition on investigations based on conduct protected by the First Amendment in the absence of reasonable suspicion that criminal activity is afoot is not properly related to remediating a federal constitutional vio-

lation; indeed the opinion explains that such a prohibition impermissibly intrudes on legitimate law enforcement prerogatives." (Def.'s Mem. at 28.) The court finds no such pronouncement. Given the *Alliance II* court's rather circuitous path to its holding, the court strains to identify the ruling repeatedly referenced by the City. This task is made especially difficult given the absence of cites directly to the *Alliance II* opinion. Judge Cudahy's comments from the dissent are instructive, "I have found it hard to pinpoint precisely what the majority has held [in *Alliance II*]." *Alliance II,* 742 F.2d at 1020, (Cudahy, J., dissenting).

not declare the lawfulness of any investigative or intelligence procedure." *Alliance,* 561 F.Supp. at 555. It appears that, at the decree's inception, both parties anticipated the possibility of disagreement over the decree's meaning in the future. "The presentations of the parties at the fairness hearing demonstrate that they would not necessarily agree on all possible applications of the language of the provisions in the abstract or in hypothetical cases. However, both sides have agreed to submit to enforcement by the Court, if and when specific disagreements arise in concrete cases in the future ... The parties' various interpretations of the principles are not binding. All that is binding now is the language of the document; the only binding interpretations will be made later, by the Court, in the context of real disputes." *Alliance,* 561 F.Supp. at 554–55. The City has offered this court no evidence to suggest that the decree was based upon a misunderstanding of the law that has now been clarified by the ruling in *Alliance II.* As such, the court rejects both of defendant's arguments that a modification of the consent decree is warranted by a change in the law under *Rufo.*

In light of the City's argument that the "decree's numerous and onerous restraints on police intelligence work have no basis in federal law and do not secure any federal right, the Decree should be modified," (Def.'s Mem. at 34), further discussion of the actual mandates of the decree and the rights guaranteed under the First Amendment is warranted. The City devotes significant energy to the advancing the argument that no federal interest is served by continued enforcement of the consent decree. The court disagrees. The district court approving the decree set forth the document's main points.

> The gravamen of plaintiffs' complaints against the settling defendants is a constitutional challenge to an alleged class-wide course and pattern of conduct consisting of three basic types of alleged domestic intelligence practices: (a) investigations of persons and groups based on their lawful exercise of First Amendment rights, (b) disruption and harassment of persons and groups engaged in the lawful exercise of First Amendment rights, and (c) the use against such persons and groups of investigative means which are overly intrusive, in violation of First and Fourth Amendment rights, or which are otherwise illegal.
>
> 10. The relief sought on behalf of the plaintiff classes is essentially twofold: a declaration that such investigations, disruption, and investigative means are unconstitutional, and an injunction prohibiting their continuation....
>
> 12. The City of Chicago Settlement includes a set of prohibitions against improper activities which apply to any agent or agency of the City of Chicago. They include the proscription of any investigation undertaken because of a person's First Amendment conduct; of any disruption of or interference with a person because of such conduct; and of any collection of First Amendment information by illegal methods.
>
> 13. Extensive regulatory provisions were written into the injunction, concerning areas of police activity that are proper but have the potential to interfere with First Amendment activities.

*Alliance,* 561 F.Supp. at 549. Defendant seems to suggest that *Alliance II* concluded that plaintiffs' federal rights under the First Amendment are limited to freedom from government activity which prevents an individual or group from engaging in protected activity. This is a misreading of the opinion. The *Alliance II* court expressed the belief that perhaps the cost of diminished First Amendment protections was outweighed by the benefits in preventing crimes of violence. It did not announce a rule of law sanctioning the abandonment of the right to be free from First Amendment intrusions altogether.

■ Defendant's reading of two additional Seventh Circuit cases is also misguided. Neither the holding in *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir.1993) (en banc), nor the holding in *David B. v. McDonald*, 116 F.3d 1146 (7th Cir.1997) suggest that the consent decree is not built upon a protectable federal right. In its memorandum, the City correctly argues that both *Evans* and *McDonald* stand for the proposition that a decree must be modified or even abandoned when it no longer serves a substantial federal interest. In *Evans*, the court made clear that "[a] consent decree may be under *System Federation* must be-based on more than consent. It depends upon rules of law that govern the public official's conduct." *Evans*, 10 F.3d at 478 (referencing *System Federation v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)).

■ The *Evans* court rejected the plaintiffs' argument in that case that the consent decree was necessary to continue protection of their purported due process and equal protection rights to obtain prompt payment of tort judgments. The Seventh Circuit expressly rejected the plaintiff creditors' equal protection argument and intimated that a due process claim would fail as well. "Unless there is a substantial claim under federal law, the district judge should not enter or continue to enforce a consent decree affecting the operation of a governmental body." *Evans*, 10 F.3d at 482. In *McDonald*, the court questioned whether any federal law or interest was furthered by the mandates of the decree and held that an Illinois statute passed subsequent to entry of a consent decree between plaintiffs and the Illinois Department of Children and Family Services (DCFS) required modification or construction of the decree that would permit DCFS to comply with the statute. *McDonald*, 116 F.3d at 1150. In so doing, the court affirmed the principles espoused in *Evans*, noting that "a substantial federal claim is essential to both entry and enforcement of a consent decree." *Id.*

The facts of these cases are distinguishable from the case now before the court. In both *Evans* and *McDonald*, either a court (in *Evans*) or a legislature (in *McDonald*) made clear that the federal right the consent decree sought to protect was not viable. A reading of *Alliance II* that suggests the Seventh Circuit no longer considers it a protectable right to be free from having political speech or other forms of expression effectively "chilled," cannot be reconciled with the current state of the law. That court recognized that the First Amendment does not only protect citizens against outright infringements upon or suppression of one's right to free speech or to engage in political, artistic or other forms of expression. It protects against other more subtle intrusions as well. The court notes:

> Admittedly the repressive effect [of the Smith guidelines] will not be zero. No one wants his name in an FBI investigatory file; and the knowledge that the FBI investigates groups that advocate violent change could deter some people from joining such groups and deter the groups themselves from engaging in lawful though minatory forms of advocacy. There would therefore be a cost to the values protected by the First Amendment, if the groups never stepped over the boundary that separates privileged from indictable speech.

*Alliance II*, 742 F.2d at 1016.

A review of Supreme Court First Amendment cases suggests that the right to hold ideas or beliefs concerning public or social policy, or political, educational, cultural, economic, philosophical or religious matters, the right to assemble privately concerning such ideas or beliefs, the right to advocate alternative systems of government, and the right to associate in connection with legal advice and litigation—protections sought by plaintiffs under the decree—are alive and well and still protected under the First Amendment. *See R.A.V. v. St. Paul*, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)

("The government may not regulate [speech] based on hostility-or favoritism-towards the underlying message expressed"); *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (holding that a statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) citing, *Consolidated Edison Co. v. Public Service Comm'n of New York*, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) ("[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic"). Courts still recognize that the Constitution still protects citizens against harassment, unwarranted investigation and surveillance based upon the exercise of First Amendment rights. They have simply held that these rights are not without limitation. *See Madsen v. Women's Health Center*, 512 U.S. 753, 754, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (balancing right of abortion opponents to protest in front of abortion clinics against government interest in protecting a woman's freedom to seek lawful medical or counseling services, ensuring public safety and order, and protecting citizens' property rights). This court found no holdings that would render the rights furthered by the consent decree in this case unprotected.

 Furthermore, the law does not require modification simply because the consent decree here operates at a level above the constitutional floor. "It is well-established that consent decrees may embody conditions beyond those imposed directly by the Constitution itself .... The condition must, of course, be one that is related to elimination of the condition that is alleged to offend the Constitution." *See Komyatti v. Bayh*, 96 F.3d 955, 959 (7th Cir.1996). The procedural safeguards, reporting requirements and prohibitions against unwarranted investigations or surveillance established in the consent decree meet this burden. Each of the conditions are grounded in one principal goal: to protect citizens' against potential First Amendment violations by the City's agents who perform investigative activity that is directed toward First Amendment conduct. *See* Decree, 1.1; *Alliance*, 561 F.Supp. at 561.

### 3. Changed circumstances under *Dowell*

 Next, the City argues that the fact that it has complied for several years necessitate that the decree be modified. Principally, defendant contends that under *Board of Educ. of Oklahoma City Public Schools, Independent School Dist. No. 89, Oklahoma County, Okl. v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the mandates of the consent decree are no longer necessary to protect plaintiffs against infringements of their constitutional rights. According to defendant, "the City has undisputedly complied with the Decree's provisions for a substantial period of time and there is no claim that it has continued or is likely to resume the practices that gave rise to the Decree." (Def.'s Mem. at 34.) As such, since it appears "unlikely" that the City will "revert to the misconduct that spawned the decree," the court should lift "requirements upon the Chicago Police Department that go beyond the First Amendment limitations for other police departments." (Def.'s Mem. at 34, 43.)

Magistrate Judge Bobrick once again rejected the City's argument. Judge Bobrick first disputes the City's contention that *Dowell* controls on this issue. He suggests that the consent decree in *Dowell* and cases like it are distinguishable from the one here and that compliance alone is not enough to obligate the court to modify the decree. In *Dowell*, the Supreme Court distinguished desegregation decrees from other types of decrees and held that "a finding by the District Court that the

school system was being operated in compliance with the Equal Protection Clause, and that it was unlikely that the Board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved." *Dowell,* 498 U.S. at 238, 111 S.Ct. 630.

 The court agrees with Judge Bobrick's interpretation of *Dowell.* The standard established in that case does not apply here. The *Dowell* court makes very clear that ordinarily "compliance alone cannot become the basis for modifying or dissolving an injunction." *Dowell,* 498 U.S. at 246, 111 S.Ct. 630 (citations omitted). However, in the case before the Court the consent decree was aimed at reaching a different end. "From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Dowell,* 498 U.S. at 248, 111 S.Ct. 630. Therefore, once that end—remedying past discrimination—was met, it can be argued that, the work of the consent decree was complete. The same cannot be said here. The goals of the consent decree in this case were proscriptive, not remedial. "The City of Chicago Settlement contains specific agreements with respect to future activities of the City of Chicago which would for the first time specifically prohibit political spying and harassment by the City .... They include the proscription of any investigation undertaken because of a person's First Amendment conduct; of any disruption or interference with a person because of such conduct; and of any collection of First Amendment information by illegal methods." *Alliance,* 561 F.Supp. at 543, 549.

Further proof of *Dowell's* inapplicability in this case is the Court's discussion of *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The Court maintained that the standard enunciated in *Swift,* that a decree could not be lifted or modified absent a showing of "grievous wrong evoked by new and unforeseen conditions," *Swift,* 286 U.S. at 119, 52 S.Ct. 460, would be inappropriate

in assessing the need for continuing a desegregation decree. *See Dowell,* 498 U.S. at 248, 111 S.Ct. 630. Unlike the decree in this case, in *Swift,* and others where the parties agree to refrain forever from certain activity, the decrees in desegregation cases like *Dowell* are intended as temporary remedies and are to be lifted once the specified goal is achieved. Of course, the *Swift,* "grievous wrong" standard was eventually replaced by the more flexible one announced in *Rufo,* not the *Dowell* standard. The distinction the *Dowell* court makes between the desegregation decree and the one in *Swift* suggests that it would be inappropriate to use the *Dowell* standard in considering modification of the *Alliance.*

The court therefore rejects the City's argument that the *Dowell* standard should apply in this case and as such, without a showing of either a significant change in factual conditions or in law under *Rufo,* the court cannot modify the decree.

Judge Bobrick concluded that, even if showing compliance were sufficient, the City's compliance under the consent decree was not undisputed. In light of plaintiffs' allegations of at least six instances of noncompliance, Judge Bobrick found that "it is not beyond dispute that the City has complied with the decree." (R & R at 22). Of course, the City maintains first that none of plaintiffs' allegations can be assumed true for the purposes of this motion. However, just as plaintiffs' allegations should not be assumed true, they cannot be ignored and assumed false either. This court need not reach the question of whether or not the City has established a record of compliance under the decree. As noted above, the appropriate standard for modifying a decree under Rule 60(b) was enunciated in *Rufo,* not *Dowell.* As such, the issue of whether the City has fully complied with the decree is not relevant.

**4. Policy Arguments**

 First, the court notes that much of the City's policy argument is based upon a

misinterpretation of the consent decree. Many of the "prohibited activities" the City complains of, are in fact, not prohibited under this court's reading of the Decree. The decree expressly permits the investigation of First Amendment conduct in the course of performing a valid governmental function. "The Judgment permits, but regulates, investigative activity that is directed toward First Amendment conduct in the course of performing a valid governmental function specified herein." Decree, ¶ 1.1.3; *Alliance*, 561 F.Supp. at 561. Both the Alliance and ACLU plaintiffs agree. (*See* Alliance Mem. at 36) ("The City's purported interpretation of the decree as prohibiting or impeding law enforcement is not based on any expressed interpretation by the court or the Plaintiffs"); ACLU Mem. at 21 ("the City bases its claim for modification on an alleged need to perform activities that the Decree already permits"). Since many of the City's claimed prohibited activities are actually permitted, the court finds that the City's concerns that continued enforcement of the decree is bad public policy are exaggerated.

■■■ The City specifically makes two additional arguments aimed at persuading the court to consider the policy implications of the continued enforcement of the consent decree. First, the City raises a number of federalism concerns. Defendant writes, "[i]n determining whether to vacate or modify a consent decree, a court should consider the importance of restoring control over local functions to those officials that are accountable to the local electorate, rather than having an unelected and unaccountable judiciary control local institutions indefinitely." (Def.'s Mem. at 43.) Whenever a court is called upon to exercise its monitoring function, it must constantly keep in mind the hallowed principles of separation of powers and federalism. This court is no exception. As the *Evans* court reminds us, a consent decree "entangles an arm of the federal government in the administration of another sovereign, monitoring the budgetary decisions of a Mayor and City Council rather than

enforcing strictly legal rights." Again, such a step "may be taken with justification." *Evans*, 10 F.3d at 477–78. Such a justification exists here.

While the court does not believe modification of the consent decree is warranted here, it is mindful of the boundaries courts must respect when balancing the individual freedoms protected under the Constitution and the rights of local and State governments to fashion their own laws and policies so as to protect their citizens. Were there no federal interest to be protected in this case, the court would be obligated to extract itself. *Evans*, 10 F.3d at 479. However there is an important federal interest involved in this litigation. As noted above, the First Amendment protections the decree was designed to further are still recognized under the law.

Furthermore, the consent decree does not mandate that "municipal officials—and the electorates to which they are accountable—should forever be deprived of their right to control the instrumentalities of local government." (Def.'s Mem. at 44.) If that were so, the court is quite sure that the City would not have entered into the consent decree, regardless of which administration was in charge. In fact, "[c]ounsel for both parties state that the City of Chicago Settlement negotiated by them in their considered opinion, is fair, reasonable and adequate." *Alliance*, 561 F.Supp. at 544. The consent decree does not require the City to relinquish control over investigations, it merely provides procedural safeguards to ensure that the City does not abuse the control it maintains to investigate and prevent criminal activity.

The City also maintains that the decree must be modified because of the significant burdens continued compliance and enforcement places on it's ability to serve and protect Chicago citizens. Each of the parties engage in an extensive discussion of various investigative activities the City believes the decree prohibits. The court has thoroughly examined each parties' submissions and concludes that much of what the

City believes is prohibited is not. The City is authorized, under relevant law and the decree to engage in investigative activity that is directed toward First Amendment conduct, as long as a "valid governmental purpose" exists. *Alliance*, 561 F.Supp. at 561. Therefore, contrary to what the City argues, much of its proposed investigative activity directed at terrorism or political crimes, gangs, policing demonstrations, hate crimes, and inter-jurisdictional efforts falls within the boundaries of the decree. "It is the expectation of the parties ... that the great majority of police activity (e.g. investigation of property crimes, personal violence, narcotics and gambling, as well as routine patrol and on view enforcement action) will not be affected this Judgment." *Id.*[5]

**Additional Related Motions**

The court assumes that its discussion concerning the parameters of the consent decree will assist the parties in future construction of the decree and therefore, the court denies the Alliance plaintiffs' motion for an interpretation of the consent decree as moot. Under Section II.A.1 of the decree, the parties may request interpretation of the decree. To the extent the parties still have questions, the court invites each of the parties to submit a motion for an interpretation of the consent decree that is directed at *specific* provisions of the decree as well as *proposed conduct.* The court also denies Countermedia Petitioners' motion to set a trial date and Alliance Plaintiffs, et al.'s petition to enforce the consent decree as moot.

### Conclusion

For the reasons set forth above the court adopts the Report and Recommendation issued by Magistrate Judge Bobrick as modified in this Memorandum Opinion and Order. The court therefore denies the City's motion to modify the Chicago Consent Decree [3076–1]. The court also de-

5. Having found that no modification of the consent decree is warranted, the court need not consider whether the City's proposed decree is sufficiently tailored to conform to the current state of the law and the facts of the

nies as moot, Alliance plaintiffs' motion to interpret the consent decree [3098–1], Countermedia plaintiffs' motion to set a trial date [3119] and plaintiffs' third amended petition to enforce the consent decree as moot [3120].

case. However, the court notes for the record that the City's proposal appears to be a significant deviation from the original consent decree.